**United States District Court**
**Middle District of Florida**
**Tampa Division**

**Robert Cothran, as the representative**
**of a class of similarly situated**
**persons, and on behalf of the Electric**
**Supply Employee Stock Ownership Plan,**

      **Plaintiff,**

**v.**                                     **Case No.:**

**George M. Adams Jr., Sandra Brock,**
**Shaker Brock, Kelly A. Pound, and**
**Harold Irwin,**

      **Defendants.**
_____/

## CLASS ACTION COMPLAINT

## Nature of the Action

1.     Plaintiff Robert Cothran ("Plaintiff"), as the representative of the Class described herein, and on behalf of the Electric Supply Employee Stock Ownership Plan (the "ESOP"), brings this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants George M. Adams Jr., Sandra Brock, Shaker Brock, Kelly A. Pound,[1] and Harold Irwin (collectively "Defendants").

_____

[1] Defendants George M. Adams Jr., Sandra Brock, Shaker Brock, and Kelly A. Pound, collectively, are also referred to as "the family."

1

2.     As described herein, Defendants illegally liquidated employees' retirement benefits (shares of Electric Supply of Tampa, Inc. ("ESI") stock) held in the ESOP trust, redeeming the ESOP's shares for less than fair market value a week before a private equity transaction in which the equivalent ownership was valued significantly higher.

3.     Defendants were motivated to keep the money in the family and abused their positions in doing so. Defendants George Adams Jr. and Sandra Brock, brother and sister and ESI's principal owners, were the only two members of the Plan Committee, which had the power to dictate sale terms to the ESOP trustee. As Plan Committee members, Adams Jr. and Sandra Brock answered only to ESI's board—controlled by themselves and their children, Defendants Kelly Pound and Shaker Brock. The only other member of the board was the family's longtime employee, Defendant Harold Irwin, who doubled as the ESOP trustee. The family and Irwin forced the ESOP to divest its ESI shares at a discount, thereby leaving more value for the family in the ensuing recapitalization of the company.

4.     Plaintiff and other ESOP participants paid the price. Plaintiff received a smaller distribution from the ESOP due to Defendants' actions and omissions. Plaintiff brings this action on behalf of the ESOP, and ESOP participants as a class, to recover lost benefits and remedy Defendants' unlawful conduct.

## Introduction

5.     Defendant Adams Jr., along with his father, George Adams Sr., led ESI for decades after its founding in 1969. ESI epitomized a "family business." It was built by a father-son team, its stock was closely-held by family members, and its board was controlled by the family.

6.     In 2011, after Adams Sr. died, the company created the ESOP.  The family soon began transferring shares of their ESI stock to the ESOP, with the goal of transferring majority ownership to the ESOP over time. Adams Jr. and his sister, Sandra Brock, established themselves as the only two members of the ESOP's Committee (the "Plan Committee). Harold Irwin, ESI's Chief Financial Officer at the time, was appointed the ESOP's trustee.

7.     For the first few years of the ESOP's existence, the family sold shares to the ESOP annually in furtherance of its stated goal of transferring majority ownership to the ESOP.

8.     In the ensuing years, ESI enjoyed rapid growth. As the company flourished, the family lamented its commitment to the ESOP and had a change of heart. Rather than continuing to transfer ownership to the ESOP, the family held onto ESI's stock. Contributions to the ESOP earmarked for the purchase of ESI stock were instead left in cash.

9.     In 2020, Defendants aggressively shopped the company, hoping to cash in on the company's increase in value. While a sale could have benefited

3

both the family and the ESOP, the family begrudged the ESOP its share of the company's success. Defendants decided to reclaim the ESOP's shares at below market value and then personally capture the true value of those shares in a subsequent recapitalization of the company with an outside investor.

10.   Defendants' heist from the ESOP was engineered in two steps. First, on April 9, 2021, ESI converted to a limited liability company. As part of the conversion process, Defendants repurchased, or caused ESI to repurchase, the ESOP's shares of ESI stock at a price of $3.3 million.

11.   Five days later, on April 14, 2021, ESI entered a "strategic partnership" with a private equity firm, Supply Chain Equity Partners ("SCEP"). Discovery will prove that SCEP purchased majority ownership of ESI from Defendants based on a valuation of ESI that was significantly higher than the valuation that Defendants used to calculate the $3.3 million price paid for the ESOP's shares.

12.   In the liquidation of the ESOP, Plaintiff and other ESOP participants received a fraction of the sum they would have received had the ESOP's stake in ESI received the same valuation Defendants and SCEP agreed to in the SCEP deal.

13.   The ESOP's loss was Defendants' gain. Defendants benefited from shorting the ESOP through a corresponding increase in the value of their own ESI stakes.

14. Each Defendant acted as a fiduciary in connection with the liquidation of the ESOP's shares and violated their fiduciary duties pursuant to ERISA in connection with the liquidation. Rather than permitting the ESOP to participate in the private equity transaction or applying that deal's valuation to Defendants' repurchase of the ESOP's shares, Defendants worked in concert to execute a plan to "buy low" from the ESOP and "sell high" to SCEP, ensuring that Defendants captured more than they were entitled to through the SCEP deal at the expense of ESOP participants.

15. Plaintiff brings this action pursuant to 29 U.S.C. §§ 1104, 1106 & 1132(a)(2)-(3) to remedy Defendants' unlawful conduct, recover losses to the ESOP, and obtain other appropriate relief.

## Jurisdiction and Venue

16. Plaintiff brings this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

17. This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

18.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and several of the fiduciary breaches occurred in this district.

## **Company Background**

19.     In 1970, George Adams Sr. founded Electric Supply Inc., an electrical products distributor. Thereafter, his children, George Adams Jr., and Sandra Brock, joined the company. After Adams Sr.'s death in 2009, Adams Jr. took the helm at ESI.

20.     In 2011, ESI rolled out the ESOP. At the time, Adams Jr. and Sandra Brock wanted to honor all that ESI employees had given to the company over the years. In a message posted to the company's website for employees and prospective employees, Adams Jr. and Sandra Brock stated that their "ultimate goal" was transfer "a large majority percentage" of ESI to employees, which they believed would "ensure the company endured for future generations."

21.     ESI had $93 million in revenue in 2011.

22.     In 2014, ESI completed construction of a new 400,000 square foot facility. With increased capacity and efficiency, revenues and profits soared. Emerging markets in Central and Latin America also offered new opportunities and higher operating margins.

23.     In 2020, ESI reached $166 million in revenue.

## Parties

### *Plaintiff*

24.     Plaintiff Robert Cothran was employed by ESI as an auditor from 2009 until 2021, when he retired. Plaintiff was a participant in the ESOP, where he had shares of ESI stock allocated to his individual account in the ESOP. He received a distribution of cash proceeds from Defendants' redemption of his shares. If Defendants had complied with ERISA and provided fair value in exchange for the ESOP's shares, more cash proceeds would have been allocated to his account and distributed to him in connection with the termination of the ESOP. Plaintiff was therefore injured by Defendants' actions.

### *The ESOP*

25.     The ESOP was established effective January 1, 2011 by ESI. The ESOP was administered at ESI's headquarters in Tampa, Florida. The ESOP was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); an "individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as "defined contribution plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6).

26.     The ESOP's participants were employees of ESI with more than one year of service. ESI was thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). In its capacity as the ESOP employer, ESI was a "party in

interest" to the ESOP under 29 U.S.C. § 1002(14)(C). The ESOP had around 109 participants at inception and grew to more than 180 participants by 2021.

27.    The ESOP was administered by the "Plan Committee." The Plan Committee members were designated the named fiduciaries of the ESOP pursuant to 29 U.S.C. § 1102. The Plan Committee members were appointed by ESI's board of directors.

28.    The ESOP's assets were held by a trustee appointed by ESI's board of directors. The trustee controlled the ESOP's shares. The Plan Committee had discretionary authority to direct the trustee with respect to the purchase and sale of ESI stock.

29.    In 2012, 2013, and 2015, ESI contributed cash to the ESOP, and the ESOP purchased ESI shares from the family as follows:

| YEAR | SHARES PURCHASED |
|------|------------------|
| 2012 | 29,154 |
| 2013 | 11,840 |
| 2015 | 24,528 |
| TOTAL | 64,450 |

30.    After 2015, the family stopped selling ESI shares to the ESOP. In 2016, 2017, and 2018, ESI made contributions to the ESOP in cash, but no shares were purchased. In 2019 and 2020, the ESOP received dividends on shares acquired in 2012, 2013, and 2015, but no contributions or new shares. The contributions made in 2016 and thereafter sat in cash accounts until the

ESOP's termination in 2021. As of the end of 2020, $2.8 million in cash was sitting in a cash account earning interest at a rate of less than 0.1% per year.

31.     On or around April 9, 2021, the family repurchased, or caused ESI to repurchase, the ESOP's 64,450 shares for $3.3 million. The ESOP was terminated effective April 14, 2021, and its assets were distributed in full in 2021 and 2022.[2]

*Defendants*

32.     Defendant George Adams Jr. served on ESI's board of directors throughout the ESOP period. He also served as the company's President and Chief Executive Officer. As a board member, he appointed himself to the Plan Committee and appointed Defendant Irwin as the ESOP trustee.  As one of two Plan Committee members (the other being his sister Sandra Brock), Adams Jr. had authority to direct the ESOP trustee to sell the ESOP's shares. He also had authority, as a Plan Committee member, to administer the ESOP. Based on his authority and actions with respect to the ESOP as both a member of the Plan Committee and board member, Adams Jr. was a fiduciary of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii) and 29 U.S.C. § 1102.

---

[2] It would therefore be futile to attempt to seek relief administratively through the ESOP's benefit claim process. The ESOP has been terminated for nearly two years and has no assets, and Defendants are no longer in control of the company. Only a court can order the relief sought.

33.   Adams Jr. owned more than 10% of ESI's stock immediately prior to the repurchase of the ESOP's shares and at the time that the ESOP was terminated. As an owner, officer, and director of ESI, Adams Jr. was a party in interest to the ESOP as defined by 29 U.S.C. § 1002(14)(A), (H).

34.   Defendant Sandra Brock served on ESI's board of directors throughout the ESOP period. As a board member, she appointed herself to the Plan Committee, and appointed Defendant Irwin as an ESOP trustee.  As one of two Plan Committee members (the other being her brother Adams Jr.), Sandra Brock had authority to direct the ESOP trustee to sell the ESOP's shares. She also had authority, as a Plan Committee member, to administer the ESOP. Based on her authority and actions with respect to the ESOP as both a member of the Plan Committee and board member, Sandra Brock was a fiduciary of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii) and 29 U.S.C. § 1102.

35.   Sandra Brock owned more than 10% of ESI's stock immediately prior to the repurchase of the ESOP's shares and at the time that the ESOP was terminated. As an owner and director of ESI, Sandra Brock was a party in interest to the ESOP as defined by 29 U.S.C. § 1002(14)(A), (H).

36.   Defendant Shaker Brock (Sandra Brock's son and Adams Jr.'s nephew) joined ESI's board of directors in 2010 and was a director for the entirety of the ESOP's existence. Shaker Brock served ESI in several roles,

including VP of Operations, VP of Digital Strategy and Marketing, and Chief Marketing and Technology Officer. Along with other board members, he had authority to appoint and remove Plan Committee members and the ESOP trustee. Based on his authority and actions with respect to the ESOP as a board member, Shaker Brock was a fiduciary of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii).

37.     Shaker Brock owned ESI stock immediately prior to the repurchase of the ESOP's shares and at the time that the ESOP was terminated. As a director and officer of ESI, Shaker Brock was a party in interest to the ESOP as defined by 29 U.S.C. § 1002(14)(F), (H).

38.     Defendant Kelly Pound (Adams Jr.'s daughter and Sandra Brock's niece) has been ESI's assistant secretary since 2009. Pound joined ESI's board of directors in 2011 and was a director for the entirety of the ESOP's existence. Along with other board members, she had authority to appoint and remove Plan Committee members and the ESOP trustee. Based on her authority and actions with respect to the ESOP as a board member, Pound was a fiduciary of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii).

39.     Pound owned ESI stock immediately prior to the repurchase of the ESOP's shares and at the time that the ESOP was terminated. As a director and officer of ESI, Pound was a "party in interest" to the ESOP as defined by 29 U.S.C. § 1002(14)(F), (H).

40.    Defendant Harold Irwin—the only defendant who is not a member of the Adams and Brock family—has held a variety of roles with ESI since 2004, including Treasurer, President, and most recently, Chief Executive Officer. He joined the board of directors in 2012 and was the ESOP trustee for the ESOP's entire existence. Based on his authority and actions with respect to the ESOP as a board member and trustee, Irwin was a fiduciary of the ESOP as defined by 29 U.S.C. § 1002(21)(A)(i) & (iii) and 29 U.S.C. § 1102.

## ERISA Overview

### *29 U.S.C. § 1106(a)*

41.    ERISA prohibits transactions between a plan and a party in interest, and transactions designed to benefit a party in interest. *See* 29 U.S.C. § 1106(a)(1)(A) & (D).

42.    ERISA's prohibition on party in interest transactions is excused only if the fiduciaries and other participants to the transaction can prove that the plan received "adequate consideration" in the deal. *See* 29 U.S.C. § 1108(e)(1); *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 935 (N.D. Ill. 1998) ("[D]efendants bear the burden of proving that the transaction [redeeming ESOP shares] was fair and of benefit to the ESOP shareholders.").

43.    "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations

12

promulgated by the Secretary." 29 U.S.C. § 1002(18); *see also Montgomery*, 39 F. Supp. 2d at 919 ("It must be shown that they arrived at their determination of adequate consideration in good faith by way of a prudent investigation and the application of sound business principles of evaluation.").

44.     "Fair market value" is customarily considered to be "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset." *See* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17637 (May 17, 1988).[3]

45.     An ESOP share redemption transaction is also a prohibited transaction if it is designed to benefit a party in interest, as such a transaction constitutes the "use" of plan assets for the benefit of a party in interest, and the "indirect … transfer" of plan assets to the party in interest. *See Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *6 (C.D. Cal. Apr. 18, 2016) (company directors "caused … [the company] to redeem [the company's]

---

[3] Courts and practitioners customarily use this definition for guidance, although the regulation was never enacted. *See Brundle v. Wilmington Tr.*, 919 F.3d 763, 770 (4th Cir. 2019), as amended (Mar. 22, 2019) ("Department of Labor (DOL) has proposed, but never enacted, regulations" defining "adequate consideration." Nonetheless, "courts look to these regulations for guidance"); *Montgomery*, 39 F. Supp. 2d at 936–37 (citing unenacted regulation).

stock held by the Plan" in order to sell that stock to a third party and thereby "indirectly transferred Plan assets to [themselves]" because the directors received other consideration from the third-party buyer); *Montgomery*, 39 F. Supp. 2d at 939 (company director that benefited indirectly from ESOP redemption was "clearly liable for having failed to sell the [ESOP's] stock [back to the company] for adequate consideration.").

### *29 U.S.C. § 1106(b)*

46.    ERISA also demands that fiduciaries "shall not" act for their own account or otherwise act adversely to a plan. *See* 29 U.S.C. § 1106(b).

47.    Specifically, a fiduciary "shall not" "deal with the assets of the plan" for their own interest or account (§ 1106(b)(1)); "act on behalf of a party whose interests are adverse to the interests of the plan" in a "transaction involving the plan" (§ 1106(b)(2)); or "receive any consideration for [their] own personal account from any party" in a "transaction involving the assets of the plan" (§ 1106(b)(3)).

48.    Just as with 1106(a), transactions prohibited by section 1106(b) are excused only if the fiduciary and other participants to the transaction can show that the plan received adequate consideration for the ESOP shares. 29 U.S.C. § 1108(e)(1).

49.    Section 1106(b) "should be read broadly in light of Congress' concern with the welfare of plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113,

126 (7th Cir. 1984). Technical separation between a fiduciary's gain and the plan do not defeat evidence of a "link" between the two. *See McMaken v. GreatBanc Tr. Co.*, 2019 WL 1468157, at *8 (N.D. Ill. Apr. 3, 2019); *see also Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*, 51 F.3d 1319, 1325 (7th Cir. 1995) (a transaction with "intent" to "prompt[] or induce[]" a transaction involving the plan is not "independent" of the plan).

50.    A company's redemption of ESOP stock to benefit a board member is a fiduciary self-dealing transaction in violation of section 1106(b). *See Montgomery,* 39 F. Supp. 2d 915,935 ("The transaction in which [company] redeemed more than 95% of the outstanding shares involved self-dealing" where the "motive behind the transaction was the transfer of ownership to [company president and board member].")

*29 U.S.C. § 1104(a)(1)*

51.    A fiduciary is also liable for failing to act prudently and loyally with respect to any matter involving the fiduciary's duties to the plan. 29 U.S.C. § 1104(a)(1); *see also Brundle v. Wilmington Tr.,* 919 F.3d at 763, 773 (4th Cir. 2019) ("[A]n ESOP fiduciary is liable to the plan participants if it breached its fiduciary duties, i.e., failed to act 'solely in the interest of the participants,' with the care, skill, prudence, and diligence used by a 'prudent man acting in a like capacity.'").

52.     An independent trustee is liable if its "decision-making process [is] inadequate." *Id.* at 774. In order to satisfy its duty, a trustee must consider the motivations of the parties and "investigat[e] whether [such motivations] affected the ESOP's legality under ERISA." *Id.* at 778. A trustee must be "critical" of information supplied by company management if management has "financial incentives" in the deal. *Id.* at 775.

53.     If the acquisition of a plan's stock will benefit company insiders, the "corporate insiders with fiduciary duties to the [plan] are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh*, 727 F.2d at 124–26.

54.     ERISA's fiduciary standard also applies to actions that "influenc[e] the outcome of [an independent advisor's] valuations" of company stock. *Perez v. Bruister*, 823 F.3d 250, 259–60 (5th Cir. 2016); *see also Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996) ("limiting the information conveyed to the expert" in order to "sway the final valuation that will set the transaction price" was a fiduciary act).

### *29 U.S.C. § 1105(a)*

55.     Fiduciaries may also be liable for their actions with respect to other fiduciaries. *See* 29 U.S.C. § 1105(a). Section 1105 requires a fiduciary to attempt to "prevent or remedy the breach" of another fiduciary. *In re Amsted*

16

*Indus., Inc. Litig.*, 263 F. Supp. 2d 1126, 1130 (N.D. Ill. 2003). Company insider fiduciaries may be liable for "enabling a fiduciary breach by [the ESOP trustee]" by failing to provide true valuation information to the trustee. *See Placht v. Argent Tr. Co.*, 2022 WL 3226809, at *9 (N.D. Ill. Aug. 10, 2022).

*29 U.S.C. § 1132(a)(3)*

56.    Although ERISA sections 1104–1106 do not "explicitly impos[e] a duty upon an 'other person' not to" participate in a fiduciary's violations, the Supreme Court has held that one of ERISA's remedies provisions, section 1132(a)(3), "itself imposes certain duties" upon non-fiduciaries. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245, 248 (2000). This is because section 1132(a) calls for "appropriate equitable relief"—relief that traditionally included "restitution" from non-fiduciaries who benefited from fiduciary misconduct with "notice of the fiduciary's breach of duty." *Id.* at 250; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) ("A person who obtains a benefit in breach of a fiduciary duty ... [or] in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed.").

57.    Courts commonly use the phrase "knowing participation" as shorthand to describe prohibited engagement by a non-fiduciary in an ERISA violation. *See Walsh v. Vinoskey*, 19 F.4th 672, 677–78 (4th Cir. 2021). In the context of a transaction prohibited by section 1106, "to knowingly participate"

17

is to "have knowledge" that the plan's counterparty received consideration "in excess of fair market value." *Id.*; *see also Dolins v. Cont'l Cas. Co.*, 2017 WL 3581143, at *7 (N.D. Ill. Aug. 18, 2017) (allegation that non-fiduciary "had reason to know that the [transaction] would benefit it and, by extension, [a party in interest], to the Plan beneficiaries' detriment" was "plainly enough" to state a knowing participation claim); *Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015) (participants may seek relief from "a knowing, gratuitous transferee" of an ESOP transaction).

58.    A claim for knowing participation in breach of section 1104 duties may also be made based on a showing that non-fiduciaries had reason to know that the price was unfair to the plan, and thus that the fiduciaries did not engage in a satisfactory review process. *See Placht*, 2022 WL 3226809, at *9 ("The [non-fiduciary defendants] have provided no logical or textual basis for distinguishing a claimed violation of 29 U.S.C. § 1104 from one under 29 U.S.C. § 1106 [for purposes of a knowing participation claim.]"); *Gamino v. KPC Healthcare Holdings, Inc.*, 2021 WL 5104382, at *6 (C.D. Cal. Nov. 1, 2021) (reasonable to infer that non-fiduciaries, "given their roles and their knowledge of the value of the securities[,] knowingly participated in [fiduciary's] ERISA § 404 breach.").

**Defendants' Actions and Omissions Related to Repurchase of the
ESOP's Shares and Recapitalization of the Company**

*The Fair Market Value of ESI's Stock*

59.     ESI finished 2020 with around $166 million in revenue, capping a

10-year run (since the founding of the ESOP) of consistent growth:

| Year | Revenue |
|------|---------|
| 2011 | $93 million |
| 2012 | $95 million |
| 2013 | $98 million |
| 2014 | $103 million |
| 2015 | $109 million |
| 2016 | $127 million |
| 2017 | $146 million |
| 2018 | $158 million |
| 2019 | $162 million |
| 2020 | $166 million |

60.     ESI also grew efficiently. ESI's annual revenue grew by more than

75% during the ESOP period with only a 33% increase in staff. ESI was ranked

in the top 15 electrical products distributors nationwide in sales per employee.

61.     Based on its sales performance and efficiency, ESI should have

been worth more than $100 million at the time that Defendants repurchased

the ESOP's shares in April 2021. In an analogous transaction completed two

weeks prior to Defendants' repurchase of ESI shares from the ESOP, Rumsey

Electric (also an ESOP-owned company) sold to an outside buyer for $153

million on the strength of 2020 sales of around $230 million—a 67% ratio of

value to revenue. Applying the same value to revenue ratio to ESI yields a

valuation of $111 million. And ESI's sales per employee were higher than Rumsey's by more than 25%, warranting a premium for ESI shares based on ESI's efficiency.

62.     Publicly traded electrical products distribution companies have stable valuations. For example, WESCO is a publicly traded electrical productions distribution company that, like ESI, has strong international sales and a division focused on communications and video. During the six months leading to Defendants' repurchase of the ESOP's ESI stock, WESCO's value ranged between 60% and 75% of its annual revenue, with an average value to revenue ratio around the 67% mark reflected in the Rumsey sale.

63.     In determining the fair market value of a stock, a valuation "based on actual sales … comes as closely as may be to that fair market value, so often judicially defined as the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell." *Elmhurst Cemetery Co. of Joliet v. Comm'r of Internal Revenue*, 300 U.S. 37, 39 (1937). For publicly traded stocks the fair market value is the market price, but the same rule applies for privately held stocks such as ESI. *See Fitts' Est. v. Comm'r*, 237 F.2d 729, 731 (8th Cir. 1956) ("In determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business, … are the best criterion of market value.").

64.    Discovery will show that the fair market value of ESI at the time of the April 2021 ESOP repurchase transaction was more than $100 million.

*The Value Received by the ESOP for ESI Stock*

65.    The value received by the ESOP for its ESI stock was based on a valuation of ESI that was less than half its fair market value, and likely considerably so.

66.    The process used to determine the price that the ESOP would receive was not the same process used by Defendants to determine the value of ESI in the SCEP deal closed less than a week later.

67.    Rather than take the value agreed to in connection with the SCEP sale and apply it to the ESOP's shares, Defendants valued ESI on a separate track in the manner of an annual share valuation. This process was deficient for the ESOP share repurchase transaction for multiple reasons. First, it did not reflect the actual price that an arms-length buyer was willing to pay for ESI—the best evidence of the value of ESI shares. *See supra* ¶ 63. Second, the annual share valuation process was subject to Defendants' self-serving manipulations. An annual share valuation is used in the absence of a market sale to determine the price that retiring participants will receive if they elect to sell their shares back to the company. This process relied on subjective inputs from Defendants and was subject to Defendants' self-interest in keeping cash in the company and paying as little as possible to retiring participants.

21

68.     According to the ESOP's annual report filed with the Department of Labor, the ESOP sold its 64,450 shares of ESI stock to the "ownership group" of ESI for $3.3 million. In prior annual reports, the "ownership group" label was used to identify the family when the family sold shares to the ESOP. At this stage, Plaintiff does not have access to sufficient information to determine if the ESOP sold its shares directly to family members, or if the family gained control of the ESOP's shares by causing the company to repurchase them. In either case, the ESOP's annual report is plain that the ESOP liquidated its shares of ESI common stock for $3.3 million in cash, and therefore Defendants did not allow the ESOP to convert its shares to membership interests and participate in the SCEP deal.

69.     Plaintiff does not have access to sufficient information at this stage to determine the precise valuation used to determine that the ESOP's stake was worth only $3.3 million. However, the valuation could have been no higher than $51 million, which means that the ESOP was shortchanged by at least half. The true damage was likely greater. A valuation of $51 million assumes that the company had issued all 1,000,000 of its authorized shares at the time of the transaction, and therefore the ESOP's 64,500 shares were worth 6.45% of the total company value.[4] Yet it would be unusual for a corporation to issue

---

[4] $3.3 million ÷ 0.645 = $51 million.

all its authorized shares.[5] Therefore, the valuation that Defendants used to determine the $3.3 million price was likely less than $51 million, shortchanging the ESOP even more.

70.     Each Defendant was involved in the repurchase transaction in multiple ways and had knowledge of its terms. Each member of the family was a buyer or beneficiary in the transaction through the enlargement of their own stake in ESI. As board members, each family member also had to the approve the concurrent termination of the ESOP, and would have understood why the ESOP was being terminated. Adams Jr. and Sandra Brock, as Plan Committee members, directed the trustee to transfer the ESOP's shares. And Irwin, as the trustee, executed the transfer. As the company's CEO and a member of the board, Irwin understood the context for the repurchase and how the terms were calculated. He also knew that the family had secured a more valuable deal through SCEP, in which the same interest was valued significantly higher.

*The Recapitalization*

71.     Just five days after buying out the ESOP's shares for cheap, the family reaped the true value of those shares in the recapitalization with SCEP.

---

[5] *See* James Chen, *Authorized Stock: Definition, Example, Vs. Issued Stock*, INVESTOPEDIA (Apr. 21, 2022) ("The number of authorized shares is typically higher than those actually issued, which allows the company to offer and sell more shares in the future if it needs to raise additional funds.). *available at* https://www.investopedia.com/terms/a/authorizedstock.asp (last visited Mar. 3, 2023).

23

72.    The SCEP deal was the result of a year-long search, valuation, bidding, and due diligence process. Adams Jr. spent a full year or more looking for an outside investor group who would be a good fit. The family engaged an investment banker to advise them on the value of the company and solicit offers from potential buyers. This effort resulted in multiple bids, and the family negotiated to obtain the best final price from SCEP.

73.    The family's bankers had access to the same market information that supported the Rumsey deal and that showed that comparable public companies were valued at around 67% of annual revenue. *See supra* ¶¶ 61–62. ESI's business profile and performance in particular were appealing to the market, as evidenced by Defendants' receipt of multiple competing offers. Discovery will show that the SCEP deal was based on a valuation of ESI consistent with its market value of more than $100 million.

74.    The SCEP deal was a recapitalization, meaning that the company's capital structure underwent a significant change in connection with the deal. First, ESI converted to a limited liability company. Defendants used the conversion process to buy out the ESOP, allowing the family to convert its stock to membership interests and own 100% of the converted company.

75.    Second, the family sold membership interests in the converted company to a vehicle created by SCEP for purposes of the deal called Electrical Products Acquiror LLC ("EPAL"). Each member of the family received cash for

24

interests transferred to EPAL. Adams Jr. and Sandra Brock also retained minority ownership interests in the recapitalized company, either through retention of membership interests in SCEP or the issuance of membership interests in EPAL.

76.     Regardless of the form (cash or membership interests) or entity (the converted ESI or EPAL) through which the family enjoyed the proceeds of their ESI stock on the other side of the deal, the family benefited by repurchasing the ESOP's stock for less than fair value. With the ESOP's divestment, the size of each family member's stake in ESI increased. By exchanging their enlarged stakes for cash or membership interests in the recapitalized company at fair value, the family effectively transferred the amount by which they shortchanged the ESOP to themselves. Based on their positions as board members and Plan Committee members, each family member Defendant knew that their proceeds from the SCEP deal were inflated by cutting the ESOP out of the deal.

*Imprudent Management of Plan Assets*

77.     As described *supra* ¶ 30, the company made contributions to the ESOP in 2016, 2017, and 2018, but did not use those monies to purchase company stock. An ESOP is a form of retirement plan; indeed, participants cannot withdraw assets without penalty until after age 59-1/2. A prudent fiduciary would not have allowed nearly half the Plan's assets to sit in a cash

account earning less than 0.1% per year for over 5 years. By imprudently managing the funds held by the Plan that were not invested in company stock, Defendants breached their duty of prudence under 29 U.S.C. § 1104. *See Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747, at *2–3 (D. Mass. Apr. 16, 2020).

## Plan-Wide Relief Allegations

78.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the ESOP pursuant to this statutory provision.

79.     Plaintiff seeks recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seeks equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(3).

80.     Plaintiff is adequate to bring this derivative action on behalf of the ESOP, and his interest is aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the ESOP.

## Class Action Allegations

81.    Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

82.    Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP at the time that the ESOP was terminated, excluding any Defendant or other employee of ESI with fiduciary responsibility on behalf of the ESOP related to the repurchase transaction.

83.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 180 participants.

84.    <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was an ESOP participant and Plaintiff suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiff consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

85.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of

interest with any Class members that would impair or impede his ability to represent such Class members.

86.  <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.  Whether the Defendants were fiduciaries with respect to the ESOP and the scope of their fiduciary duties;

b.  Whether the ESOP's fiduciaries failed to comply with the fiduciary standards of prudence and loyalty;

c.  Whether the family or company was obligated to provide adequate consideration for the repurchase of the ESOP's shares;

d.  Whether the family or company provided adequate consideration for the redemption of the ESOP's shares;

e.  Whether Defendants and ESI were parties in interest to the ESOP;

f.  Whether the repurchase of the ESOP's shares constituted a prohibited transaction;

g.  Whether Defendants profited from Defendants' violations of ERISA;

h.  The proper form of equitable and injunctive relief; and

i.   The proper measure of monetary relief.

87.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

88.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

89.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class

member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

90.    Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

**<u>Count I</u>**
**29 U.S.C. § 1106(a)**
*Against Adams Jr., Sandra Brock, and Irwin*

91.    Plaintiff incorporates Paragraphs 25–28, 31–45, 55, 67–70, and 73–76 by reference.

92.    The repurchase of the ESOP's shares by the family or, alternatively, by the company and for the benefit of the family, constituted one or more prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A) & (D).

93.    Defendants Adams Jr. and Sandra Brock caused the prohibited transactions in their capacities as the ESOP fiduciaries responsible for directing the trustee to transfer the ESOP's shares to the family or to ESI. Defendant Irwin also caused the prohibited transactions in his capacity as the ESOP fiduciary who transferred the shares to the family or to ESI.

30

94.     The circumstances around the transaction show that the consideration provided for the ESOP shares in the repurchase transaction was inadequate and below-market value.

95.     Defendant Irwin knew that the transaction was prohibited and the consideration inadequate but followed orders and completed the transaction without objection and without attempting to secure fair value for the ESOP. Defendant Irwin is therefore also jointly liable, pursuant to 29 U.S.C. § 1105(a), with Adams Jr. and Sandra Brock for their violations of 29 29 U.S.C. § 1106(a).

96.     Adams Jr., Sandra Brock, and Irwin caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. Adams Jr. and Sandra Brock profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. They are also liable for appropriate equitable relief to be determined by the Court. Irwin is also jointly liable to the same extent as Adams Jr. and Sandra Brock.

### Count II
**29 U.S.C. § 1106(b)**
*Against All Defendants*

97.     Plaintiff incorporates Paragraphs 27–28, 31–40, 46–50, 55, 67–70, and 73–76 by reference.

98.     Defendants Adams Jr. and Sandra Brock dealt with ESOP assets for their own benefit in violation of 29 U.S.C. § 1106(b)(1) by directing the trustee to transfer ESOP shares for less than fair value to themselves or to the company for their personal benefit.

99.     Defendants Adams Jr. and Sandra Brock acted on behalf of interests adverse to the ESOP—the interests of the family—in transactions involving the ESOP in violation of 29 U.S.C. § 1106(b)(2) by directing the trustee to transfer ESOP shares for less than fair value to themselves or to the company for the benefit of the family.

100.    Defendants Adams Jr., Sandra Brock, Shaker Brock, and Pound received consideration from a party dealing with the ESOP in connection with a transaction involving the assets of the ESOP in violation of 29 U.S.C. § 1106(b)(3) by receiving enlarged stakes in ESI through the ESOP repurchase transaction.

101. The circumstances around the transaction show that the consideration provided for the ESOP shares in the repurchase transaction was inadequate and below-market value.

102.    Defendant Irwin knew that the transaction was prohibited and the consideration inadequate but followed orders and completed the transaction without objection and without attempting to secure fair value for the ESOP. Defendant Irwin is therefore also jointly liable, pursuant to 29 U.S.C. §

1105(a), with Adams Jr., Sandra Brock, Shaker Brock, and Pound for their violations of 29 U.S.C. § 1106(b).

103. The family Defendants caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. They also profited from the above-mentioned prohibited transactions and are liable to the ESOP for their profits. They are also liable for appropriate equitable relief to be determined by the Court. Irwin is also jointly liable to the same extent as the family Defendants.

**Count III**
**29 U.S.C. § 1104(a)(1)**
*Against All Defendants*

104. Plaintiff incorporates Paragraphs 27–28, 31–40, 51–55, 59–76 by reference.

105. Defendants Adams Jr., Sandra Brock, and Irwin, as Plan Committee members and ESOP trustee, were responsible for determining a fair price for the ESOP's shares in connection with the repurchase transaction. Adams Jr., Sandra Brock, and Irwin failed to act solely in the interest of ESOP participants in this process. Instead, they subverted the valuation process to prevent the shares from being appraised based on accurate, complete, and up-to-date information used in the SCEP deal. Defendants Adams Jr., Sandra Brock, and Harold Irwin therefore failed to comply with the fiduciary standard of care and duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1).

106.   As board members, all Defendants had a fiduciary duty to monitor the appointed fiduciaries: the Plan Committee members and trustee. Shaker Brock and Pound were the only two board members who were not also fiduciary appointees. Shaker Brock and Pound had a duty to monitor the actions of Adams Jr., Sandra Brock, and Irwin and ensure that they discharged their fiduciary duties in compliance with ERISA. In the process leading to the ESOP share repurchase and recapitalization of the company, Shaker Brock and Pound learned, through their own participation in those transactions as ESI shareholders and as board members responsible for terminating the ESOP, that Adams Jr., Sandra Brock, and Irwin engineered an unfair deal for the ESOP. Shaker Brock and Pound has a duty to intervene on behalf of the ESOP and attempt to remove their parents and Irwin from their positions to prevent them from completing the unfair transaction. Shaker Brock and Pound instead turned a blind eye because it benefited them personally, in breach of their fiduciary duties to the ESOP.

107.   Defendants also breached their fiduciary duty of prudence by allowing the Plan's assets to sit in a cash account earning less than 0.1% interest for over 5 years. This demonstrates a failure to act in accordance with the investment goals and time horizon of the Plan, and evidences a failure to exercise sufficient care or due diligence in monitoring the Plan's investments

and investigating potential alternatives that would better align with participants' financial objectives.

108.   Had Defendants performed their fiduciary duties in the prudent and loyal manner required by ERISA, Plaintiff and other ESOP participants would have received additional benefits.

109.   Defendant Irwin knew that the family Defendants breached their fiduciary duties but followed orders and completed the transaction without objection and without attempting to secure fair value for the ESOP. Defendant Irwin is therefore also jointly liable, pursuant to 29 U.S.C. § 1105(a), with Adams Jr., Sandra Brock, Shaker Brock, and Pound for their violations of 29 U.S.C. § 1104(a)(1).

110.   The family Defendants caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and are liable to the ESOP for those losses. They also profited from the above-mentioned fiduciary breaches and are liable to the ESOP for their profits. They are also liable for appropriate equitable relief to be determined by the Court. Irwin is also jointly liable to the same extent as the family Defendants.

## Count IV

**29 U.S.C. § 1132(a)(3)**
*Against Adams. Jr., Sandra Brock, Shaker Brock, and Pound*

111.   Plaintiff incorporates Paragraphs 27–28, 31–40, and 56–76 by reference.

112.   Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary breach from a knowing participant in the breach. *See Harris Trust*, 530 U.S. at 238; *Placht*, 2022 WL 3226809, at *11.

113.   Without regard to their own status as fiduciaries, each family member Defendant had knowledge of the circumstances that rendered the ESOP share repurchase transaction unlawful and knowingly accepted proceeds of those violations. Each family member Defendant knew that the ESOP price was determined to be less than that value of the equivalent stake in the SCEP deal, and that the ESOP was treated less favorably in order to benefit the family. Each family member Defendant also knew that completing the repurchase transaction on an unequal basis relative to the SCEP deal would violate the duties of the ESOP's fiduciaries pursuant to ERISA §§ 1104(a)(1) and 1106(a)–(b). And each family member Defendant, in fact, received a windfall as a result of the ESOP share repurchase transaction through the enlargement of their own personal stake in ESI and receipt of undue proceeds for their enlarged stake through the SCEP recapitalization.

36

114. The family member Defendants received their undue proceeds in the form of cash and membership interests in the reconstituted company. The membership interests in the reconstituted company should be returned to the ESOP. The cash proceeds may be traced through any changes in form through the discovery process, and then should be returned to the ESOP.

115. Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, the family member Defendants are liable to the ESOP, without regard to their status as fiduciaries or liability for profits pursuant to 29 U.S.C. 1109(a), for undue proceeds of the ESOP fiduciaries' violations of ERISA.

## **PRAYER FOR RELIEF**

116. Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

    A.    Certify Plaintiff's authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

    B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as the class representative, and certify his counsel as class counsel;

    C.    Order Defendants to make good to the ESOP all losses resulting from their violations of ERISA;

    D.    Order the family member Defendants to disgorge all profits received through use of the assets of the ESOP;

    E.    Impose a constructive trust or equitable lien or surcharge with respect to, and an accounting of, all proceeds of fiduciary breaches and prohibited transactions received by

the family Defendants;

F.   Appoint an independent trustee of the ESOP to oversee the allocation of losses, profits, and proceeds recovered on behalf of the ESOP to ESOP participants, consistent with the terms of the ESOP and ERISA;

G.   Approve a fair and equitable plan of allocation of any losses, profits, or proceeds recovered on behalf of the ESOP to ESOP participants;

H.   Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

I.   Award prejudgment and post-judgment interest; and

J.   Award such other and further relief as the Court deems just and equitable.

DATED: March 8, 2023.                    Respectfully Submitted,

*/s/ Marc R. Edelman*
**MARC R. EDELMAN**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-223-5505
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

*/s/ Brandon J. Hill*
**BRANDON J. HILL**
Florida Bar Number: 0037061
Direct Dial: 813-337-7992
**LUIS A. CABASSA**
Florida Bar Number: 053643
Direct No.: 813-379-2565
**AMANDA E. HEYSTEK**

Florida Bar Number: 0285020
Direct Dial: 813-379-2560
**WENZEL FENTON CABASSA P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

*/s/ Carl F. Engstrom*
**CARL F. ENGSTROM** (*pro hac vice motion forthcoming*)
Minn. Bar No. 0396298
**MARK E. THOMSON** (*pro hac vice motion forthcoming*)
Minn. Bar No. 0398260**
**ENGSTROM LEE MCDONOUGH THOMPSON & THOMSON LLC**
729 N Washington Ave, Suite 600
Minneapolis, MN 55401
Telephone: 612-305-8349
cengstrom@engstromlee.com
mthomson@engstromlee.com

*Attorneys for Plaintiff*